STATE of Minnesota, Respondent,

v.

Robert Darren OLSON, Appellant.

No. C3–88–687.

Supreme Court of Minnesota.

Feb. 24, 1989.

Rehearing Denied March 28, 1989.

Glenn P. Bruder, Bruce C. Douglas, Edina, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Tom Johnson, Hennepin County Atty., Anne F. Peek, Asst. County Atty., Minneapolis, for respondent.

SIMONETT, Justice.

Defendant Robert Olson appeals his conviction for first degree murder, three counts of armed robbery, and three counts of second degree assault. He claims, among other things, that his arrest was illegal, lacking probable cause and accomplished by a warrantless entry of the place where he was staying. We conclude Robert Olson's constitutional rights were violated by the warrantless entry requiring suppression of tainted evidence, and reverse for a new trial.

On Saturday morning, July 18, 1987, shortly before 6 a.m., a lone gunman robbed an Amoco station in Minneapolis, shooting to death the station manager. The police were quickly alerted and, from the description of the robbery, suspected Joseph Ecker. Two officers drove to Ecker's home, arriving at about the same time as a brown Oldsmobile pulled up. The Oldsmobile tried to escape, spun out of control, and came to a stop. Two white males got out of the car and fled on foot. In short order one of the two men, who proved to be Joseph Ecker and who was identified as the robber-gunman, was captured inside his home. The other man, unidentified but described as tall, thin, a white male in his early twenties with sandy brown hair, escaped. It was now about 6:15 a.m.

Inside the abandoned Oldsmobile police found a sack of money and the weapon soon thereafter identified as the murder weapon. Also in the car was a title certificate showing the Oldsmobile's owner to be Keith Jacobson. The name Rob Olson appeared on the certificate as a secured party but with the name crossed out; the bottom half of the certificate, used to transfer title, was missing. There was also a letter in the car, dated May 11, 1987, from an insurance company, addressed to *Roger R.* Olson, 3151 Johnson Street. A second search of the car pursuant to a search warrant revealed a videotape rental receipt dated July 16, 1987 (2 days earlier), issued to Rob Olson. The police verified that a Robert Olson lived at 3151 Johnson Street. The police talked to Ecker and a woman who had been in the house when Ecker was arrested. Neither identified Robert Olson as having been in the getaway Oldsmobile or connected with the robbery. The woman gave the names of persons who had been with Ecker the night before; Olson's name was not among them. The police were unable to locate Keith Jacobson.

The next day was Sunday, July 19. In the morning a woman called the police and said a man by the name of Rob was the driver of the getaway car and was planning to leave town by bus. The caller gave her

name as Dianna Murphy. About noon the woman called again, said she was Dianna Murphy, and gave her address and phone number. She said that a woman named Maria lived on Garfield Northeast and gave Maria's phone number. Maria, she said, had told her that a man named Rob had admitted to Maria and to two other women, Louanne and Julie, that he was the driver in the Amoco robbery. The caller said Louanne was Julie's mother and the two women lived at 2406 Fillmore Northeast.

The detective-in-charge who took the second telephone call did not attempt to verify the identity of the caller. If he had, he would have learned no one by the name of Dianna Murphy lived at the address and phone number given. Neither was Maria contacted. The detective did, however, send police officers to 2406 Fillmore to check out Louanne and Julie. The Fillmore address proved to be a duplex. Louanne Bergstrom and her daughter Julie resided in the upper unit but were not home. Louanne's mother (Julie's grandmother) lived in the lower unit. She confirmed that a Rob Olson had been staying upstairs and promised to call the police when Olson returned. The grandmother was not aware of Olson's involvement in any robbery. A pickup order was then issued for Olson's arrest.

About 2:45 p.m., the grandmother called police and said Olson had returned. The detective then instructed police officers to surround the house. No effort was made to obtain an arrest warrant. The detective later explained in court that he had never attempted to get an arrest warrant on a weekend during his 20 years on the force. After the house was surrounded, the detective phoned Julie and told her Rob should come out of the house. The detective heard a male voice say "tell them I left." Julie then said that Rob had left, whereupon the detective ordered the police to enter the house. They did so with drawn weapons and without seeking permission. Defendant Olson, age 19, was found hiding in a closet.

After his arrest, defendant admitted to the police that he had driven Joseph Ecker from Ecker's house to an apartment building on Second Avenue Southeast near the Amoco station on University Avenue. Olson said Ecker had asked for a ride to pick up a girlfriend; that on the way he stopped at the Amoco station to buy cigarettes and pop; and that he then parked by the apartment building about a block from the station. He said Ecker was gone about 10 minutes and returned with a gun and a bag and ordered Olson to drive him home. Olson said he fled from the police at the Ecker house because he was scared of Ecker. Subsequent investigation disclosed that Olson had bought the Oldsmobile from Keith Jacobson but title had not yet been transferred. Defendant's defense at trial was that he had been duped into driving Ecker to the scene of the robbery.

The two main issues on appeal concern the legality of defendant's arrest. Was there probable cause? Did circumstances justify a warrantless, nonconsensual entry of the duplex? Defendant argues both these questions must be answered no, and, therefore, evidence obtained from his arrest—most importantly, his statement to the police—should have been suppressed.

### I.

When police have arrested a suspect without a warrant, the test is whether the officers in the particular circumstances, conditioned by their own observations and information and guided by the whole of their police experience, reasonably could have believed that a crime had been committed by the person to be arrested. *State v. Merrill,* 274 N.W.2d 99, 108 (Minn.1978). A determination of whether the police had probable cause to arrest is a determination of constitutional rights, and this court makes an independent review of the facts to determine the reasonableness of the police officer's actions. *See Ker v. California,* 374 U.S. 23, 34, 83 S.Ct. 1623, 1625, 10 L.Ed.2d 726 (1963).

At the time of defendant's arrest the police knew that a robbery-homicide had occurred. They had arrested one suspect, Joseph Ecker, and had a description of the unknown driver. In the getaway car was a

certificate of title listing Keith Jacobson as the car's owner. The name Rob Olson was on the title certificate but as a secured party and the name was crossed out. A receipt for a videotape rental, dated 2 days earlier, was also in the car, issued to Robert Olson.

The trial court found that this physical evidence alone, without the informant's tip, was sufficient to establish probable cause. We have our doubts. As defendant points out, this evidence only suggested Olson might have had some property or lien interest in the getaway car and that he may have ridden in the car 2 days before the robbery. Keith Jacobson would seem to have been a more likely suspect. Significantly, although the police had this physical evidence on Saturday, they did not issue a pick-up order for Olson until Sunday, after receiving the telephone tip from "Dianna Murphy."

■ Consequently, the question becomes whether the tip was reliable and if it together with the physical evidence establishes probable cause. In evaluating an informant's tip, the court looks at the commonsense totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed. 2d 527 (1983). In this case, the police knew nothing about the informant's identity or reliability. If the police had called the number "Dianna Murphy" gave them or checked her name in the telephone directory, they would have found there was no such person. The caller did not claim any personal knowledge of the information related, simply passing on what she had apparently been told by Maria, another unidentified source. On the other hand, the police did verify that at least part of the information given was correct, namely, that two women named Louanne and Julie lived at the address given and that a Rob Olson was staying there. The police also knew that the getaway car was connected in some way with a man named Rob Olson, which lent credence to the informant's statement that Rob Olson was the driver of the getaway car.

"[T]he fact that police ·can corroborate part of the informer's tip as truthful may suggest that the entire tip is reliable." *State v. Siegfried*, 274 N.W.2d 113, 115 (Minn.1978). In *Siegfried*, however, the informant was known to the police as a reliable private citizen and had obtained the reported information by personal observation; further, the information had been accepted by a magistrate in granting an application for a search warrant. *See also State v. Wiley*, 366 N.W.2d 265 (Minn.1985) (corroboration on a non-key item and informant had history of past reliability). The trial court here relied on *State v. Causey*, 257 N.W.2d 288 (Minn.1977); but in *Causey* a magistrate had found probable cause for issuing a search warrant based on information supplied by a known reliable informant who accompanied the officer to the defendant's residence, where a car registered to a convicted drug possessor was parked. *Cf. State v. Eling*, 355 N.W.2d 286 (Minn. 1984) (police made extensive efforts verifying informant's identity and source of information). Nevertheless, there is force to the state's argument in this case that "Dianna Murphy's" tip was sufficiently corroborated so that, together with other known information, there was probable cause.

A review of our cases reveals, what should come as no surprise, that the "totality of the circumstances" test is fact-specific. In this case we conclude we need not resolve the probable cause issue because the issue of warrantless entry, which we next discuss, proves to be dispositive.

## II.

Defendant claims the warrantless entry of the duplex at 2406 Fillmore to seize him was a violation of his fourth amendment rights. The state counters that defendant lacks standing to make this challenge; but, even if standing exists, exigent circumstances justified the warrantless entry of the duplex. We conclude defendant's constitutional rights were violated.

It is unclear why an arrest warrant was not obtained in this case, particularly since we have encouraged law enforcement officers to obtain a warrant whenever possible.

*See Merrill,* 274 N.W.2d at 108. The previous day, Saturday, the police had no difficulty in obtaining a search warrant for the car in 2½ hours. Here, however, apparently no attempt was made to obtain an arrest warrant because it was Sunday, surely a curious reason for not observing the constitutional safeguards of citizens.

### A.

For defendant Olson to challenge the warrantless entry and seizure of his person at Louanne's house, he must show a legitimate expectation of privacy in the upper duplex at 2406 Fillmore. *See State v. Brown,* 345 N.W.2d 233, 237 (Minn.1984). For some days prior to the robbery, Olson had been living with Ecker at 2420 Polk. On Friday night he did not return to Ecker's house until 4:30 a.m., having been out on a date. On Saturday night Olson did not return to Ecker's house, nor to his own, because he was afraid of being arrested; instead he stayed that night at Louanne Bergstrom's duplex. The trial court found that Olson had no reasonable expectation of privacy in the 2406 Fillmore residence. The court said Olson was not a tenant; that he had no possessions at the duplex except for a change of clothes; and that he slept on the floor. This ruling ignores, however, the fact that Olson had permission to stay at 2406 Fillmore for some indefinite period, and that Louanne Bergstrom testified Olson had the right to allow or refuse visitors entry. While the United States Supreme Court has rejected the notion that anyone legitimately in a dwelling automatically has standing to challenge an illegal search, *Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), this does not mean that a guest never has standing. *See also United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (overruling the holding in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) that possession of a seized good creates standing). Indeed, this case is quite similar to *Jones,* where an expectation of privacy was found. Jones had permission to stay at a friend's apartment; he had a key; he had a change of clothes; his home was else-

where; and he had slept at the friend's apartment for "maybe a night." *Id.* at 259, 80 S.Ct. at 730. Although the *Rakas* court subsequently qualified the rationale of *Jones,* it expressly reaffirmed the factual holding of that case. *Rakas,* 439 U.S. at 142–43, 99 S.Ct. at 429–30. *See also Steagald v. United States,* 451 U.S. 204, 230–31, 101 S.Ct. 1642, 1656–57, 68 L.Ed.2d 38 (1981) (Rehnquist, J., dissenting).

The trial court thought it significant that Olson was trying to evade the police so that his presence at 2406 Fillmore was "wrongful." Not so. A reasonable expectation of privacy is not forfeited (nor to be emasculated) because of the defendant's motives for seeking privacy. As LaFave explains, "to deny standing merely because it turns out the defendant had a criminal purpose is in sharp conflict with the rationale underlying the exclusionary rule." 4 W. LaFave, *Search and Seizure* § 11.3(b) at 299 (2d ed. 1987).

Finally, the state argues that defendant had no *actual* expectation of privacy. In *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), the United States Supreme Court said that to challenge an illegal search a defendant must have an actual expectation of privacy as well as one that society is prepared to recognize as reasonable. The trial court thought that defendant's statement to Julie, "tell them I've left," indicated that defendant had no actual expectation of privacy at 2406 Fillmore. We think not. This statement more likely suggests that defendant was simply attempting to discourage the police from invading his privacy by giving them a further reason, albeit of doubtful plausibility, not to enter the house.

We hold that defendant has standing to challenge the legality of his arrest.

### B.

The right to be secure in the place which is one's home, to be protected from warrantless, nonconsensual intrusion into the privacy of one's dwelling, is an important fourth amendment right. *See, e.g.,*

*Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *State v. Storvick,* 428 N.W.2d 55, 61 (Minn. 1988). To justify a warrantless arrest in a defendant's home, the state must show urgent need, *i.e.,* the presence of exigent circumstances. We make our own evaluation of the found facts (which in this case are not in dispute) in concluding whether exigent circumstances exist. *Storvick,* 428 N.W.2d at 58 n. 1. In making this determination, we have used the so-called *Dorman* analysis, with the understanding that the *Dorman* factors are part of a flexible approach that encompasses all relevant circumstances. *State v. Lohnes,* 344 N.W.2d 605, 611 (Minn.1984).[1] Thus, a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, *Welsh,* 466 U.S. 740, 104 S.Ct. 2091, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling. *Lohnes,* 344 N.W.2d 605; *State v. Hatcher,* 322 N.W.2d 210 (Minn.1982).

In this case the state claims exigent circumstances for a warrantless arrest in Louanne's duplex because defendant was a suspect in a murder, guns had been found in the getaway car, defendant had fled the police once, and there was information that he might try to flee again.

While it is true a grave crime was involved, it is also true that the suspect was known not to be the murderer but thought to be the driver of the getaway car. Probable cause to believe the suspect was the driver depended, as we have seen, in large part on the reliability of the unknown informant. The police had already recovered the murder weapon. The suspect had not left town by bus, at least not yet, as the telephone tip had indicated, but had returned to the duplex where he had stayed the previous night. The police knew that Louanne and Julie were with the suspect in the upstairs duplex with no suggestion of

danger to them. Three or four Minneapolis police squads surrounded the house. The time was 3 p.m., Sunday.

We do not think the particular circumstances of this case amount to exigent circumstances. It was evident the suspect was going nowhere. If he came out of the house he would have been promptly apprehended. This case is unlike *Lohnes,* for example, where the suspect was believed to have committed the crime of violence, probable cause was strong, and the weapon had not been found. In *Lohnes,* too, the dwelling was in an isolated rural area, distant from a magistrate, the time 5 a.m., and it was doubtful if sufficient police resources were on hand to contain the suspect until an arrest warrant could be obtained. *Lohnes,* 344 N.W.2d at 611–12.

Cases from other jurisdictions are split on whether surveillance or a stake-out should be used to gain time to obtain an arrest warrant. *See* 2 W. LaFave, *Search and Seizure* § 6.1(f), at 605–08 (2d ed. 1987). Again, the differing circumstances can explain the differing results. Sometimes a stake-out will adequately freeze the situation, while on other occasions the ensuing delay may increase the chances of escape or danger to others. LaFave suggests a distinction between an arrest which is planned in advance and an arrest in medias res, which occurs in the field as part of unfolding developments. *Id.* Thus, in *Lohnes,* we pointed out that the arrest was the culmination of a rapidly developing situation in the field, with only 35 minutes elapsing from the time the sheriff attempted to locate the suspect to the warrantless arrest of the suspect at his home. *Lohnes,* 344 N.W.2d at 611. *See also Welsh,* 466 U.S. at 761, 104 S.Ct. at 2103 (White, J., dissenting) ("The decision to arrest without a warrant typically is made in the field under less-than-optimal circumstances * * *."). Where, however, the arrest is planned in advance, it is less

---

1. The *Dorman* analysis considers: (a) whether the offense is a grave offense, particularly a crime of violence; (b) whether the suspect is reasonably believed to be armed; (c) whether the showing of probable cause connecting the defendant to the offense is more than minimal; (d) whether the police have strong reason to believe that the suspect is in the premise being entered; and (e) whether there is a likelihood that the suspect will escape if not swiftly apprehended. *Dorman v. United States,* 435 F.2d 385 392–93 (D.C.Cir.1970).

likely the police can claim exigent circumstances.

Shortly after 1 p.m. on Sunday the detective in charge talked with Julie's grandmother on the telephone and learned that a Rob Olson "had been staying upstairs for a day or two with Louanne and Julie," and he obtained the grandmother's promise to call if Rob returned to the house. At 2 p.m. the detective issued a pick-up order for Olson, what he called a "probable cause arrest bulletin." The police were instructed to stay away from the duplex. At 2:45 p.m. the grandmother called the detective again to report Rob had returned. Squad cars were sent to the duplex and, at 3 p.m., the detective (coordinating the arrest efforts from headquarters by radio and telephone) ordered entry of the duplex. Olson was brought to headquarters within an hour. By then the detective who had been in charge was gone. He went off duty at 3 p.m. At least by 2 p.m., then, the police had made plans for Olson's arrest at the dwelling where he was staying at such time as Olson might return. Nevertheless, in the hour that elapsed before any arrest could be made at the duplex, no effort was made to obtain an arrest warrant to enter the dwelling. We do not know if a warrant could have been obtained within that hour, or within a relatively short time thereafter; on the other hand, the state has not suggested the warrant could not have been obtained. We do know a search warrant was obtained on Saturday, the day before, in 2½ hours when the urgency to search an already impounded car was much less.

A warrantless, nonconsensual intrusion of one's dwelling is not to be lightly regarded; indeed, such an entry is considered presumptively unreasonable, and the United States Supreme Court has stressed the state bears a "heavy burden" to establish exigent circumstances. *Welsh*, 466 U.S. at 749, 104 S.Ct. at 2097. In this particular case, considering all the circumstances, we do not think that burden has been met. We hold defendant's fourth amendment rights were violated.

### C.

■ Defendant asks that all evidence obtained from the illegal arrest be suppressed. This includes Olson's statement, the statements of all persons present at 2406 Fillmore at the time of his arrest, and Joseph Ecker's statement which was obtained after the police showed him Olson's statement. Evidence obtained as a result of an illegal arrest must be suppressed unless it is obtained by means sufficiently distinguishable from the illegal exploitation to be purged of the primary taint. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Here Olson was taken immediately to police headquarters, and the police obtained a statement from him within an hour of his illegal arrest. We believe the statement was tainted and must be suppressed.

■ While the state has not argued that Olson's statement was untainted, it does argue that admission of Olson's statement at trial was harmless beyond a reasonable doubt. *See State v. Forcier*, 420 N.W.2d 884, 886–87 (Minn.1988). There was other evidence, says the state, to establish that Olson was the driver of the getaway car, and Olson's statement had no significant impact on the guilty verdicts. At trial, however, the state relied heavily on various details in Olson's statement to point out discrepancies in his story; these discrepancies were then used to argue that Olson was lying about being duped by Ecker. For example, in his statement Olson said he was in the Amoco station about 10 minutes before the robbery to buy cigarettes and pop but the surveillance videotape showed no customer in the store at that time. In final argument, the prosecutor told the jury, "Now the proof of the pudding here, ladies and gentlemen, is in this statement"; and the prosecutor then went on, point by point, to show where Olson's statement did not appear to square with other facts. Olson's credibility was a key issue at trial and use of his statement obtained as a result of the illegal arrest was not harmless error.

We reverse and remand for a new trial. As we have mentioned, defendant claims there is other evidence which should also

be suppressed along with his statement. He supports his claim only by assertion, and the record before us is unenlightening. The trial court on remand will be in a better position to deal with these claims. We need not reach other issues raised by defendant in this appeal.

REVERSED AND REMANDED FOR A NEW TRIAL.

KEITH, J., took no part in the consideration or decision of this case.