**STATE of Minnesota, Respondent,**

v.

**Daren Damont GRAY, Appellant.**

No. C4–89–1566.

Supreme Court of Minnesota.

June 1, 1990.

Rehearing Denied July 9, 1990.

John M. Stuart, State Public Defender, Mark D. Nyvold, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas L. Johnson, Hennepin County Atty., Lisa A. Berg, Asst. County Atty., Minneapolis, for respondent.

POPOVICH, Chief Justice.

Defendant Daren Damont Gray was convicted of first degree premeditated murder and first degree felony-murder for the October 31, 1988 killing of Tommie Christopher Gales in south Minneapolis. On appeal, defendant argues (1) the police officers' warrantless arrest of him in a motel room was an unreasonable search and seizure; (2) the trial court erred in refusing to give a self-defense instruction and in giving the "heat of passion" first degree manslaughter instruction selected from the two instructions submitted by defense counsel; and (3) the evidence was insufficient to support his convictions. We affirm.

I.

Defendant Gray, Clyde McCaskel, and Carl Donnell were at Rosetta Davis' apartment on the afternoon of Monday, October 31, 1988, when McCaskel telephoned his cousin, Bobby Tyson (also known as Bobby Brown) for Donnell and defendant. Defendant, who had recently arrived from Los Angeles, arranged with Tyson to buy cocaine. As McCaskel was leaving after placing the call, he overheard a male voice in Davis' apartment say, "We should stick them up." McCaskel located Tyson and told him what he had overheard. Donnell, Davis, and defendant walked about one and one-half blocks to an apartment building at 2417 17th Avenue South in Minneapolis. Defendant took with him a loaded gun from a table in Davis' apartment. Donnell and Davis decided to leave the apartment building 10–15 minutes after arriving, but defendant asked them to stay because "he couldn't do what he was going to do by hisself, [Davis] would have to stay or [Donnell] would have to stay [because] * * * someone would have to frisk [the drug dealer] while [defendant] holds the gun."

Around 11:00 p.m. on October 31, 1988, Carlus Hodges and Gales were driving to a Halloween party in a gray 1981 Cadillac when Tyson flagged them down. Gales got out of the car and talked with Tyson, then both got into the car and Tyson instructed Hodges to drive to 24th Street and 17th Avenue. When they arrived, Hodges parked three or four houses down the street and remained in the car while Gales and Tyson walked to the building at 2417 17th Avenue South and were admitted by

defendant. Tyson walked down a short flight of steps followed by Gales. As Tyson reached the bottom of the steps, he turned and saw defendant standing at the top of the steps pointing a gun at them, saying, "Give me the money." Tyson saw Gales reach into his inside jacket pocket, pull out a gun, and go up the steps. Tyson threw his money on the steps and jumped into the crawl space under the stairs. There was a short standoff with Gales and defendant each telling the other to "[d]rop it." Tyson heard gunfire, but did not see who fired the first shot. A struggle ensued between Gales and defendant. Gales asked Tyson for help in the struggle and in getting defendant's gun, but Tyson, unarmed, fled out the building's back door. In the Cadillac, Hodges heard several gunshots from the direction of 2417 17th Avenue South, turned towards the building, saw a flash and heard another gunshot.

Tyson ran around toward the apartment building's front and, peering around the corner, saw defendant bring out an unarmed Gales with a gun at Gales' back. When defendant and Gales reached the street, Tyson ran and neither saw nor heard anything further. From the car, Hodges also saw someone, whom he could not identify, pulling Gales out of the building into the street. Hodges saw this unidentified person search Gales, step back, and then shoot Gales, who fell to the ground. The shooter then turned and ran, and Hodges immediately drove away. Several neighbors heard a great deal of noise around 11:00 p.m., saw one or two men running from the scene, and noticed an older, dark Cadillac with its lights off driving away from the scene. Neighbors also saw Gales lying in the street, heard him gasping, and called the police.

When defendant returned to Davis' apartment, Donnell saw he had a gunshot wound in his side and was told by defendant that "one boy shot him, he had got shot." Defendant told Donnell there was a stand-off, then a struggle in which he was wounded, Gales surrendered, and then he shot and killed Gales. McCaskel returned to Davis' apartment early that morning "to see what really happened." Davis, Don-

nell, and defendant were present. McCaskel noticed defendant had blood stains on his shirt and defendant told McCaskel he had killed Gales.

Minneapolis police officers, responding to the reported shooting, arrived at 11:35 p.m. and found Gales dead, lying face up in the street. A search of Gales' clothing disclosed packages of cocaine in an inside jacket pocket. Police found a revolver inside the apartment building's front door, as well as a variety of bullet holes, lead and bullet fragments, and blood splatter in the entryway. Homicide detective Sgts. DeConcini and Miles interviewed several people, but found no suspects.

Under homicide department policy, the detectives who begin the day watch following a homicide assume investigative responsibility, therefore Sgts. Skala and Heise took over this case at 8:00 a.m. on November 1, 1988. At approximately 9:15 a.m. Hodges called the police and Sgt. Skala took his statement at the police station, in which he learned of Tyson's involvement. Hodges arranged for Sgt. Skala to meet Tyson, who told police Donnell knew the identity of the suspect and took them to Donnell's apartment. While returning to the police station from Donnell's apartment, Tyson and Donnell pointed out an apartment building at 2528 17th Avenue South as Davis' apartment. Between 3:00 and 4:45 p.m. at the police station, Sgt. Skala took Tyson's and Donnell's statements in which they related the above facts about the previous night. Donnell said the suspect, whom he knew as "Day–Day," was staying at Davis' apartment.

While taking these statements, Sgt. Skala had surveillance set up around Davis' apartment. Surveillance officers reported there was a lot of traffic in and out of the building. Sgt. Skala then prepared a search warrant application for Davis' apartment and the person of the suspect. It took approximately one-half hour to prepare and type the warrant application and affidavit, and at least another one-half hour to locate a judge, who signed the warrant. When police executed the search warrant for Davis' apartment at 7:25 p.m.

they found nobody, but did find a general assistance application in the name of "Daren D. Gray," and bloody bandages and bedding. A neighbor told police that Davis and "Day," who was bleeding, had left in a cab that afternoon, indicating they were going to a motel.

A call to the Red and White Cab Company at 9:00 p.m. disclosed that two people had been picked up at Davis' building and dropped off at the Fair Oaks Motel at 24th Street and 3rd Avenue in Minneapolis. At about 9:30 p.m., the Fair Oaks Motel's night manager recognized a photograph of Davis as the woman who had registered under an alias. The manager said Davis received the key to room 305, but, accompanied by a black male, recently had left in a Red and White cab. The cab driver who made the motel pickup told police she took two individuals matching Davis' and defendant's description to the area of 24th Street and 16th Avenue. The police stake-out of this area until 11:00 p.m. proved unsuccessful. The Red and White Cab Company dispatcher informed police at 11:25 p.m. that a cab picked up two individuals matching Davis' and defendant's description near where they had been left off earlier and drove them to the Fair Oaks Motel.

When Sgt. Skala learned of defendant's return to the Fair Oaks Motel, he directed Sgts. DeConcini and Miles at police headquarters to assemble the Emergency Response Unit (ERU) to assist in arresting defendant at the motel. Motel personnel reported to police that an outgoing telephone call had just been made from room 305. At approximately 11:30 p.m. Sgts. Skala and Heise began surveillance of room 305. At 11:30 p.m., Sgt. DeConcini received a call from a police dispatcher who reported that a woman had called police and said her son, Daren Gray, had been shot and was at the Fair Oaks Motel. Sgt. DeConcini relayed this information to Sgt. Skala. Although Sgt. Skala requested uniformed assistance in the surveillance, the officers assigned had a traffic accident and 30–45 minutes elapsed before another unit arrived.

None of the officers involved attempted to get an arrest warrant for Gray. Sgt. Skala, the officer in charge, testified he believed defendant was armed and wounded. Because defendant had no luggage and had traveled throughout the day, Sgt. Skala worried defendant could leave the motel at any time. Sgt. Skala did not know if room 305 was being used as a base by defendant or when he would return again. Because nearby motel rooms were occupied and room 305 faced a courtyard surrounded by two stories of other rooms with glass picture window fronts, apprehension of defendant inside his room would reduce the danger to other motel residents. Sgt. Skala also testified he could not leave to process a warrant application because he did not want to leave his partner alone at the motel.

When the ERU arrived at the scene around 1:00 a.m. on November 2nd, they were briefed by Sgt. Skala, who then directed a forceful entry of room 305 between 1:00 and 1:30 a.m. Police found Davis standing next to the bed and defendant in the bathroom nude, with a close range, recent gunshot wound in his side. Between the mattress and box spring, police found a purse containing a gun; cocaine and marijuana were also found in the room.

In the motel room, Sgt. Skala gave defendant a *Miranda* warning and determined he understood his rights and was not intoxicated. Sgt. Skala asked defendant how he got shot. Defendant said he had gone to 2417 17th Avenue South the previous night to buy crack cocaine and "got caught in the middle of a drug transaction" that resulted in a struggle on a stairway landing. Defendant stated he ducked around a wall but a gun pointed around the wall and shot him, and then he ran and "a gun reached up into his hand." This gun, he said, was the gun found in Davis' purse. Defendant only described the others involved as black "dudes," and concluded, "I came here on a mission, I accomplished it and I'm still alive."

Significant other evidence connected defendant with Gales' shooting. Both Tyson

and Donnell subsequently picked defendant out a photographic line-up. Ballistics tests were conducted by the Minneapolis Police Department's Bureau of Identification. Comparison of the bullet found in Gales' chest with test bullets fired from the .357 magnum recovered from room 305 indicated this revolver fired the shot that caused Gales' death. Cylinder flares on this gun indicated it had been fired four times since it was last cleaned. The revolver recovered from the apartment building's landing also was a .357 magnum, which had been fired twice since it was last cleaned. Some of the bullets, bullet jackets, and lead fragments, found in the entryway of 2417 17th Avenue South were matched to the two guns.

On November 1, 1988, the coroner conducted an autopsy on Gales and determined he died of "[e]xsanguination due to a gunshot wound to the chest," *i.e.*, he bled to death. A bullet that entered Gales' back just behind his right armpit pierced his lung and heart, and caused his death. This bullet passed through Gales' body at a slightly downward angle and was found lying free in his left chest cavity. This wound would have caused death within one or two minutes according to the coroner. Gales also suffered two, non-fatal gunshot wounds in his neck caused by a bullet that entered the front of his neck and exited in back. Tests on Gales' blood for drugs were negative, but his blood alcohol concentration was .11% at the time of death. At the morgue, in Gales' inside jacket pocket police found three packages of cocaine, with a weight of 60 grams and a street value of about $2,500.

On November 4, 1988, a complaint was filed in Hennepin County District Court charging defendant with first degree murder. On November 15, 1988, a Hennepin County grand jury returned an indictment charging defendant with first degree premeditated murder (Minn.Stat. § 609.185(1) (1988)) and first degree felony-murder (Minn.Stat. § 609.185(3) (1988)). The trial court determined in a *Rasmussen* hearing held on April 27, 1989, the police's warrantless arrest of defendant was pursuant to exigent circumstances. Defendant was arraigned and pled not guilty on May 30, 1989. A jury trial in Hennepin County followed, in which defendant did not testify. The jury, on June 6, 1989, returned a verdict finding defendant guilty of first degree premeditated murder and first degree felony-murder. Defendant appealed.

II.

■ Defendant argues the officers' warrantless entry and his arrest in the motel room was an unreasonable search and seizure. On appeal, in a footnote, the state contends for the first time defendant may not have a constitutionally protectible privacy interest required to object to the arrest and search of the motel room because he was an "unregistered visitor" in the room. Defendant's expectation of privacy was not mentioned by either the trial court or the State during the *Rasmussen* hearing, thus this issue was waived. *See State v. Kelley*, 295 N.W.2d 521, 522 (Minn.1980). Nevertheless, defendant clearly had a legitimate expectation of privacy in the motel room, which is necessary for a protectible fourth amendment interest. *See Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. Diaz*, 814 F.2d 454, 457–58 (7th Cir.) (citing cases), *cert. denied*, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *State v. Hatton*, 389 N.W.2d 229, 232 (Minn.App. 1986), *pet. for rev. denied* (Minn., Aug. 13, 1986).

■ Police officers are encouraged "to obtain arrest warrants whenever possible." *State v. Merrill*, 274 N.W.2d 99, 108 (Minn. 1978). This preference is the strongest when a dwelling is involved, since "to be protected from warrantless, nonconsensual intrusion into the privacy of one's dwelling is an important fourth amendment right." *State v. Olson*, 436 N.W.2d 92, 96–97 (Minn.1989), *aff'd*, — U.S. —, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *see also Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). A warrantless arrest by police in a home or similar area in which a suspect has a privacy interest is per se unreasonable unless exi-

gent circumstances exist. *Payton v. New York,* 445 U.S. 573, 586, 589–90, 100 S.Ct. 1371, 1380, 1381–82, 63 L.Ed.2d 639 (1980). The state has the burden of showing the existence of exigent circumstances. *Welsh,* 466 U.S. at 749–50, 104 S.Ct. at 2097–98. Because constitutional rights are involved in this fact specific determination, "[w]e make our own evaluation of the found facts * * * in concluding whether exigent circumstances exist." *Olson,* 436 N.W.2d at 97.

The U.S. Supreme Court has not adopted a definite test for determining when exigent circumstances exist. There generally are two types of tests for exigent circumstances: (1) single factor exigent circumstances, and (2) in the absence of any of these factors, a "totality of the circumstances" test. In certain situations a single factor alone can create exigent circumstances, including: hot pursuit of a fleeing felon, *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976); *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); imminent destruction or removal of evidence, *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966); *State v. Mollberg,* 310 Minn. 376, 384, 246 N.W.2d 463, 469 (1976); protection of human life, *Warden,* 387 U.S. at 299–300, 87 S.Ct. at 1646–47; likely escape of the suspect; *see Johnson v. United States,* 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); and fire, *Michigan v. Tyler,* 436 U.S. 499, 511, 98 S.Ct. 1942, 1951, 56 L.Ed.2d 486 (1978).

■ When none of the single factor exigent circumstances is clearly implicated, as in this case, we apply a "totality of the circumstances" test, using the following factors set forth in *Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970): (a) whether a grave or violent offense is involved; (b) whether the suspect is reasonably believed to be armed; (c) whether there is strong probable cause connecting the suspect to the offense; (d) whether

police have strong reason to believe the suspect is on the premises; (e) whether it is likely the suspect will escape if not swiftly apprehended; and (f) whether peaceable entry was made. *E.g., Olson,* 436 N.W.2d at 97; *State v. Storvick,* 428 N.W.2d 55, 58 (Minn.1988); *see Minnesota v. Olson,* —— U.S. ——, ——, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990) (affirming validity of approach). The trial court, relying on the *Dorman* factors, denied defendant's suppression motion. Sgt. Skala, the officer in charge, gave numerous reasons for arresting defendant without a warrant. Since none of the single factor exigent circumstances are present, we examine these reasons in the context of the totality of the circumstances, using *Dorman* and *Olson* as guides.

■ Applying the *Dorman* factors, first, Gales' killing was a grave and violent offense, apparently an execution-type murder. *See State v. Lohnes,* 344 N.W.2d 605, 611 (Minn.1984). Second, the evidence indicated defendant was armed since Donnell saw defendant with a gun after the shooting and the murder weapon was not recovered at the scene. Third, based on the evidence outlined above gathered throughout the day on November 1st, police had strong probable cause to believe defendant shot Gales. Fourth, there was strong reason to believe defendant was on the premises, especially after the telephone call apparently from defendant's mother. Fifth, while escape was not likely once the motel room was under surveillance, defendant was not from the Twin Cities area, had moved around avoiding police throughout the day, and had been very active the previous night. Sixth, although peaceable entry was not made, police handled the situation admirably in making a quick entry, using limited force, and thus preventing anyone, including other motel residents, from being injured.

The *Dorman* factors, however, are not exhaustive and we have also considered the time necessary to obtain a warrant. *Olson,* 436 N.W.2d at 97; *Lohnes,* 344 N.W.2d at 612. In addition, we have used Professor LaFave's distinction between ar-

rests "planned" in advance and arrests that occur in the "field" as part of unfolding developments. *Olson*, 436 N.W.2d at 97 (citing 2 W. LaFave, *Search and Seizure* § 6.1(f), at 605–08 (2d ed.1987)). Given the 90 minute surveillance period, we think it a close question whether police had adequate time and opportunity to secure an arrest warrant. While we reject the Minneapolis Police Department's claim of inadequate resources, we feel police acted promptly. Upon learning of defendant's return to the motel, Sgt. Skala immediately called together the ERU, staked out the scene, and sent in the ERU when it arrived 90 minutes later. Although Sgt. Skala obtained a search warrant earlier that evening in slightly over one hour, obtaining an arrest warrant is more complicated, especially in the middle of the night.

With regard to LaFave's distinction, this case has aspects of both a "field" arrest and a "planned" arrest. The arrest was in the field as police were continually investigating and trying to locate defendant, whom they had lost several times, since mid-afternoon, but the 90 minute surveillance period while the ERU assembled indicates a planned arrest. Given the existence of virtually all the *Dorman* factors, and based on the totality of the circumstances, in our judgment the police acted promptly pursuant to exigent circumstances when they made a warrantless arrest of defendant in his motel room.

*Olson* also supports this result. The U.S. Supreme Court stated: "[I]n the absence of hot pursuit * * * the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered." *Minnesota v. Olson*, — U.S. at —, 110 S.Ct. at 1690. These factors all indicate exigent circumstances existed, because defendant was an armed murderer in the middle of a motel. *Olson* dealt with a suspected get-away driver, who was believed unarmed, and was staying with friends at a duplex. 436 N.W.2d at 94. Here the police were dealing with a wounded, armed, execution-style murderer who was on the run and might be on drugs, in a potentially dangerous situation at a public motel. In such a situation, we believe exi-

gent circumstances for a warrantless arrest existed.

## III.

 Defendant argues the trial court erred in refusing to instruct the jury on self-defense. A trial court can refuse to instruct on a theory of defense if there is insufficient evidence to support it. *State v. Coleman*, 373 N.W.2d 777, 781 (Minn.1985). Three conditions must be present in order to excuse or justify the use of deadly force in self-defense:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Boyce*, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969) (*citing* Minn.Stat. §§ 609.06 & 609.065 (1988)). In addition,

An aggressor in an incident has no right to a claim of self-defense. However, where the defendant is the original aggressor in an incident giving rise to his self-defense claim, an instruction on self-defense will be available to him only if he actually and in good faith withdraws from the conflict and communicates that withdrawal, expressly or impliedly, to his intended victim.

*Bellcourt v. State*, 390 N.W.2d 269, 272 (Minn.1986); *see also State v. Mitjans*, 408 N.W.2d 824, 833 (Minn.1987); *State v. Baker*, 280 Minn. 518, 522, 160 N.W.2d 240, 242 (1968). Once a defendant raises the issue of self-defense, the state has the burden of proving beyond a reasonable doubt the defendant's actions were not reasonable by establishing the nonexistence of any element. *State v. Buchanan*, 431 N.W.2d 542, 548 (Minn.1988); *State v. Austin*, 332 N.W.2d 21, 23 (Minn.1983).

The question then is whether there was sufficient evidence from which a reason-

able juror could have found defendant acted in self-defense. *Bellcourt,* 390 N.W.2d at 272. In order for a self-defense instruction to have been justified, a reasonable juror must have been able to find that:

1)(a) defendant was not the aggressor or

(b) defendant was the aggressor but properly withdrew from the confrontation, and

2) the fatal shot occurred inside the apartment building.

■ Evidence indicating defendant was the aggressor includes a statement from Tyson, apparently the only witness to the beginning of the confrontation, that defendant pulled a gun first and attempted to rob Gales and himself. Donnell testified defendant took a gun with him, intended to rob whoever came to sell him drugs and, based on what defendant told him, must have pulled his gun first. Defendant primarily points to facts indicating Gales may have had the upper hand in the struggle at times, but this does not detract from defendant's status as the initial aggressor. The only evidence indicating Gales—and not defendant—was the initial aggressor are defendant's statements, as related by Donnell to the police. On cross-examination, Donnell agreed he told police that defendant told him "two dudes tried to rob him." Donnell, however, admitted he lied in one of his statements to the police.

In addition, this statement impeached Donnell as being inconsistent with his testimony that defendant planned to rob the drug dealer and that defendant must have pulled his gun first. A prior inconsistent statement can be used only for impeachment, not as substantive evidence, when the trial court gives a limiting instruction, such as here. *State v. Marchand,* 302 Minn. 510, 511, 225 N.W.2d 537, 538 (1975); *see also* C. McCormick, *McCormick on Evidence* §§ 34, 39, 251, at 73, 85, 744 (3d ed. 1984). We agree with the trial court there was insufficient competent substantive evidence from which a reasonable juror could have concluded defendant was not the aggressor.

In order for an aggressor to receive a self-defense instruction a reasonable juror

must be able to conclude the aggressor withdrew or retreated from the confrontation and successfully communicated this withdrawal. *See Bellcourt,* 390 N.W.2d at 272 ("an aggressor has the duty to employ all means in his power to avert the necessity of killing, and before his right to self-defense may be revived, he must clearly manifest a good-faith intention to withdraw from the affray and must remove any just apprehension or fear the original victim may be experiencing"). There is no evidence defendant withdrew from the confrontation. Defendant again points to testimony that may suggest Gales had the upper hand in the struggle at times, but this is not a legally sufficient withdrawal. In addition, defendant suggests because there is not eyewitness testimony to the whole struggle, he may have acted in self-defense. It is not possible, however, for a reasonable juror to draw such an inference *solely* from an *absence* of evidence concerning every second prior to the shooting. *See Truesdale v. Friedman,* 270 Minn. 109, 127, 132 N.W.2d 854, 866 (1965) (mere conjecture). On the record, the trial court's refusal to give a self-defense instruction was proper, because a reasonable juror could not have concluded defendant was not the aggressor or that defendant withdrew from the confrontation.

Defendant also argues the trial court erred in giving one of the "heat of passion" first degree manslaughter instructions defense counsel submitted, but not giving the other one submitted. "Trial courts are allowed 'considerable latitude' in selection of language in the jury charge." *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn.1986) (citations omitted); *see also State v. Daniels,* 361 N.W.2d 819, 831–32 (Minn.1985) (broad discretion). Defendant "must show that the substituted instruction contained a material misstatement of the law when read in the context of the instructions as a whole" to be prima facie evidence of error. *State v. Turnipseed,* 297 N.W.2d 308, 312 (Minn. 1980).

■ While defense counsel discussed "fright" as the basis for this instruction, counsel submitted two "heat of passion"

manslaughter instructions to the court—one with a discussion of "fright" and one without. When the court granted the request for a manslaughter instruction, it did not specifically state what the instruction would entail. The trial court then gave a jury instruction on "heat of passion" manslaughter from 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIGs 11.-05 & 11.20 (2d ed. 1985), which was identical to one submitted by defense counsel. Defense counsel objected to this instruction as not mentioning "fright," contending the court had agreed to give the instruction involving "fright." By submitting two "heat of passion" manslaughter instructions, defense counsel appeared agreeable to either. When the trial court does not agree to use a specific instruction and then adopts verbatim one submitted by defense counsel from the CRIMJIG, the court has accurately instructed the jury on the law and acted well within its discretion.

## IV.

Defendant also contends the evidence was insufficient to support his convictions for first degree premeditated murder and first degree felony-murder. The applicable standard of review is:

> In reviewing the claim of sufficiency of the evidence we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. * * * The evidence must be viewed in the light most favorable to the prosecution * * *.

*State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981). "If the jury acted with due regard for the presumption of innocence and the necessity of overcoming it with proof beyond a reasonable doubt, this court should not disturb its verdict." *State v. Underwood*, 281 N.W.2d 337, 340 (Minn. 1979). Judging the credibility of witnesses rests with the jury and on review "it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence." *Ulvinen*, 313 N.W.2d at 428.

In reviewing a conviction for premeditated first degree murder, all the events surrounding the death are relevant to a determination of premeditation and intent. *Buchanan*, 431 N.W.2d at 547. Tyson testified defendant walked Gales out of the building into the street at gunpoint. Hodges testified that someone, who obviously was defendant, pulled Gales out of the building into the street, stepped back and shot Gales, who immediately dropped to the ground. The jury could reasonably have found this to be an execution-type killing, which is a clear example of premeditated murder.

To sustain a felony-murder conviction under section 609.185(3), the state must show defendant caused Gales' death while committing or attempting an aggravated robbery. McCaskel overheard a discussion of a robbery outside of Davis' apartment. Donnell testified defendant took a gun with him and intended to rob the drug dealer at gunpoint. Tyson testified defendant attempted to rob Gales and himself in the apartment building at gunpoint. Hodges testified that someone, who clearly was defendant, frisked Gales in the street before shooting him. The jury reasonably could have concluded defendant carried out or attempted to carry out an aggravated robbery resulting in Gales' killing.

Defendant argues, first, there is no eyewitness testimony to every second of the struggle, thus the jury had to speculate as to what really happened; second, the fatal shot occurred inside the apartment building; and third, defendant acted in self-defense. Defendant exaggerates the necessity of eyewitness testimony. "[C]ircumstantial evidence * * * is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt." *State v. Rainer*, 411 N.W.2d 490, 495 (Minn.1987). In effect, defendant contends the jury is obliged to believe his story, as related by Donnell. We, however, are to assume the jury believed the state's

witnesses and no contrary evidence. *Ulvinen,* 313 N.W.2d at 428. The circumstantial evidence in combination with the significant direct evidence as outlined is sufficient to sustain defendant's convictions.

Defendant also contends the fatal shot occurred inside. Initially, even if the fatal shot occurred inside this would not detract from the felony-murder conviction, because an aggravated robbery still occurred. Since Gales came forward up the steps and struggled with defendant, the entry wound in the front of Gales' neck is more consistent with what happened during a struggle than a shot in the back. In addition, Gales *immediately* dropped after the only shot outside but had walked out of the building, with the logical conclusion being the fatal shot was fired outside. While it is unclear from the record whether the shot in the street was fired from Gales' front or back or at his head or body, the jury had the advantage of seeing this shooting demonstrated.

With regard to self-defense, because the trial court was correct in not even giving a jury instruction on self-defense, there is not enough evidence to succeed on a sufficiency argument. Because the most credible evidence and logical inferences are that the fatal shot was fired in the street while decedent was wounded in the neck inside, the jury could reasonably have found defendant prevailed in the struggle, and then brought an unarmed Gales out to the street and shot him in the back and killed him.

Affirmed.