**STATE of Iowa, Appellee,**

v.

**Aurelio Javier ORTIZ, Jr., Appellant.**

**No. 99–0882.**

Supreme Court of Iowa.

Oct. 11, 2000.

As Amended on Denial of Rehearing Nov. 7, 2000.

Linda Del Gallo, State Appellate Defender, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, and Richard J. Meyer, Special Prosecutor for Emmet County, for appellee.

LARSON, Justice.

Aurelio Ortiz was convicted of one count of delivery or possession with intent to deliver methamphetamine, Iowa Code § 124.401(1)(c)(6) (1997) (Count I), one count of distributing methamphetamine to a person under age eighteen within 1000 feet of a public park, Iowa Code § 124.406(1)(a) (Count II), one count of delivery or possession with intent to deliver cocaine while in possession of a firearm, Iowa Code §§ 124.401(1)(c)(2)(b), .401(1)(f) (Count III), and one count of distributing cocaine to a person under age eighteen within 1000 feet of a public park, Iowa Code § 124.406(1)(a) (Count IV). On appeal he challenges the court's (1) failure to suppress evidence, (2) enhancement of his sentence on the basis of the 1000–feet statute, and (3) delay of mittimus pending release under a federal charge. We affirm on the first issue and vacate the sentences based on the second and third issues.

## I. *Facts and Prior Proceedings.*

On May 22, 1997, Aurelio Ortiz was introduced to Abigail Moranville, age seventeen, at Ortiz's apartment. Over the course of the next few days, Moranville returned to Ortiz's apartment three or four times to use drugs provided to her by Ortiz and to "hang out." Moranville agreed to let the defendant use her apartment to use and sell drugs because the police had been watching his apartment. From Saturday, May 24, through Monday, May 26, the defendant, with two of his sisters, his brother-in-law, and many others, participated in a three-day drug binge at Moranville's residence. People were buying and using drugs, at least some of which were sold to them by the defendant.

On May 26, at approximately 7:05 p.m., an anonymous caller to the Estherville Police Department said a party was going on at Moranville's residence. Police officers drove by Moranville's residence (variously referred to in the record as an apartment and a house) to investigate the report. They noticed several apparently underage persons in the entryway. They checked the license plates of two vehicles and confirmed one owner was under the legal drinking age.

The officers applied for and obtained a search warrant for Moranville's residence to look for alcohol and underage drinkers. The application for the search warrant cited the anonymous phone call, the officers' personal observations of that evening, and the fact that "Officers of the Dept. have observed Abby and her friends on other occasions frequenting bars in Estherville and having after-bar parties at her residence with great frequency." On the basis of this information, the Emmet County magistrate issued a search warrant for the person and residence of Abigail Moranville for alcohol and beer. Officers promptly executed the search warrant.

On the officers' entrance to Moranville's residence, they discovered approximately ten individuals, including the defendant and Moranville. The defendant, seated in a stuffed chair, attempted to conceal something that appeared to be a plastic bag between the cushion and the side of the chair. An officer told the defendant to stand up, and he did. That officer observed three packages lying on the chair— two plastic bags, commonly known as "eightballs," and a piece of magazine paper folded to contain drugs, known as a "snow seal." All of these containers were later found to contain cocaine. The defendant had a pouch around his neck with $1400 in it. Three long guns were found behind the front door. An officer also found a vial of methamphetamine upstairs, protruding from a purse. The officers also found a scale of a type used in drug transactions. The discovery of the controlled substances led to the arrest of the defendant and further search warrants. The defendant admitted the scale, money, and drugs were his. The money, he said, was needed to pay his supplier.

The defendant filed a motion to suppress all of the evidence on the basis the warrant was not supported by probable cause. The district court denied the motion on the ground Ortiz had failed to show he had a legitimate expectation of privacy while he was at the Moranville residence.

Following a trial, a jury found Ortiz guilty on all four counts charged in the trial information. However, as to one of the delivery charges, it found Ortiz was not in possession of a firearm and therefore convicted him only of delivery or possession with intent to deliver methamphetamine. The court sentenced Ortiz accordingly. The court ordered that mittimus issue "when defendant has served any prison term for pending federal charges and is released by federal authorities." Ortiz appealed.

## II. *Standard of Review.*

We review claimed violations of constitutional rights under the Fourth Amendment de novo in light of the totality

of the circumstances. *State v. Moriarty*, 566 N.W.2d 866, 867 (Iowa 1997).

### III. *The Search Issue.*

■ While Ortiz challenged the search on the basis the warrant was not supported by probable cause, the district court did not reach this issue because it found Ortiz did not have an expectation of privacy in Moranville's home and therefore could not challenge the warrant. The court observed that, if it were to reach the issue, "the existence of probable cause to support issuance of [the first search warrant for alcohol] is in grave doubt."

■ Officers must ordinarily obtain a search warrant prior to searching or entering an area where a person has a reasonable expectation of privacy. *State v. Breuer*, 577 N.W.2d 41, 45 (Iowa 1998). A person challenging the legality of a search must first show a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633, 641 (1980); *State v. Halliburton*, 539 N.W.2d 339, 342 (Iowa 1995).

■ We have said "[t]he determination of whether a person has a legitimate expectation of privacy with respect to a certain area is made on a case-by-case basis, considering the unique facts of each particular situation." *Breuer*, 577 N.W.2d at 46. Additionally, the expectation of privacy must be one that society considers reasonable, an issue that involves reference to property law or to understandings that are recognized and permitted by society. *Id.* The party challenging a search must establish that his or her *own* Fourth Amendment rights have been violated, not the rights of someone else such as, in this case, the householder. *See Rakas v. Illinois*, 439 U.S. 128, 131 & n. 1, 99 S.Ct. 421, 424 & n. 1, 58 L.Ed.2d 387, 393 & n. 1 (1978).

The Supreme Court has said a defendant challenging a search must show (1) a subjective expectation of privacy and (2)

this expectation of privacy was reasonable in light of "long-standing social custom[s] that serve[ ] functions recognized as valuable by society." *Minnesota v. Olson*, 495 U.S. 91, 98, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85, 94 (1990); *see also* 5 Wayne R. LaFave, *Search & Seizure* § 11.3, at 118–19 (3d ed.1996).

In December 1998 the United States Supreme Court decided *Minnesota v. Carter*, which compared the respective rights of overnight guests and similar persons who have a reasonable expectation of privacy with persons merely on the premises, albeit with permission, who do not have a reasonable expectation of privacy. 525 U.S. 83, 91, 119 S.Ct. 469, 474, 142 L.Ed.2d 373, 381 (1998). *Carter* was decided after the district court's ruling on the motion to suppress in this case. The district court concluded "a guest at a party does not have a reasonable expectation of privacy in items found in the house at which the party occurs," citing *United States v. Maddox*, 944 F.2d 1223, 1234 (6th Cir.1991). However, that broad conclusion must be tempered in light of *Carter*. In *Carter*, Justice Kennedy provided the fifth vote necessary for a majority, writing in a special concurrence that, "as a general rule, social guests *will* have an expectation of privacy in their host's home." *Carter*, 525 U.S. at 102, 119 S.Ct. at 479, 142 L.Ed.2d at 387 (Kennedy, J., concurring) (emphasis added). Justice Kennedy noted the defendants in *Carter* were not social guests but had used the apartment merely as a processing station to prepare drugs for sale. Relying on the specific facts presented in *Carter*, Justice Kennedy concluded the defendants were an exception to the rule that social guests will have an expectation of privacy. He wrote:

I join the Court's opinion, for its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home.

*Id.* at 99, 119 S.Ct. at 478, 142 L.Ed.2d at 386. In deciding the present case, we must be mindful of this concurring opinion, as well as the plurality opinion, because, without Justice Kennedy's concurrence, the Court's finding of no reasonable expectation of privacy would not have prevailed.

The plurality opinion in *Carter* emphasized the lack of a social relationship between the defendant and the premises searched. *Carter,* 525 U.S. at 90, 119 S.Ct. at 473, 142 L.Ed.2d at 380. The defendants in *Carter* lived in Chicago, while the apartment searched was located in Minnesota. The defendants had come to the apartment for the sole purpose of preparing cocaine for sale, they had never been to the apartment before, and they were in the apartment for only about 2½ hours. *Id.* at 86, 119 S.Ct. at 471, 142 L.Ed.2d at 378.

The Court in *Carter* discussed three factors bearing on the reasonable expectation of privacy: (1) the purely commercial nature of the transaction, (2) the defendants' relatively short period of time on the premises, and (3) the lack of any previous connection between the defendants and the occupant of the apartment. *Id.* at 91, 119 S.Ct. at 474, 142 L.Ed.2d at 381.

The party at Moranville's residence appeared to lack any reasonable degree of privacy. According to Moranville's testimony, the door was unlocked and people were walking in and out at will. This was clearly not Moranville's party. According to her, Ortiz was in charge. At one point, according to Moranville, "there [were] so many people coming in and out, I couldn't sleep." She did not even know some of the participants. She explained Ortiz's presence in her residence in the following colloquy:

Q. Would you explain to the jury how Aurelio Ortiz came to be at your apartment on Memorial Day weekend of 1997? A. He had asked me, because his apartment from what he understood was under—the cops had been watching it for drug trafficking, and he asked me if he could use it because I lived alone and I had a very big apartment so.

Q. And did you give him permission to move in with you? A. To use it, yes. Not to move in, but to use it, yes.

Q. To use it for what? A. To do whatever he needed to do, to sell, to use, whatever.

Moranville testified about Ortiz's activities in her apartment: "There was using. There was selling. There was a lot of using and there was a lot of selling." As to the first factor under *Carter,* Ortiz was using Moranville's apartment, at least in part, for commercial transactions. He was there because he believed the police were watching his apartment. Even assuming the party was partially for commercial purposes and partially for social purposes, a fair interpretation of the evidence is that any social aspect of the gathering was based on drug use, and that most of the drugs had been purchased from Ortiz.

It is significant that Moranville did not give Ortiz permission to move into her apartment—only to do "whatever" with respect to drugs. On our de novo review, the presence of Ortiz and the other participants appears to be merely an ongoing drug transaction with the customers consuming the merchandise on the premises. Moranville observed Ortiz selling the drugs. The presence of the scale and Ortiz's possession of $1400 in cash confirms at least a substantial part of the deliveries were made as commercial—not social—transactions. Ortiz, feeling the heat of police surveillance at his own place, moved his drug operations to the Moranville residence. This finding is supported by the fact that, although Moranville had earlier observed Ortiz selling drugs in his own apartment, a search of his apartment after his arrest revealed no drugs, scales, or other paraphernalia used for such a business. The obvious inference is these items had been moved to the Moranville residence.

Comparing the facts of this case to *Carter*, we note first the defendant's activity here was not limited to preparing drugs for sale as it was in *Carter*; here, it involved drug use as well. However, the fact Ortiz's customers consumed the drugs on the premises does not change the primary purpose of his presence from commercial to social. We believe it was all part of his commercial activity, which was the predominant reason for his presence in Moranville's home.

In addition, while the defendants in *Carter* remained on the premises a shorter time than here, and they had no previous connection with the householder, as Ortiz did here (a five-day acquaintance with Moranville), the Supreme Court did not suggest in *Carter* these distinctions would be dispositive if the purpose of the defendant's presence on the premises was commercial in nature. Here, as in *Carter*, Ortiz was "one simply permitted on the premises," *Carter*, 525 U.S. at 91, 119 S.Ct. at 474, 142 L.Ed.2d at 381, and he failed to show he had a reasonable expectation of privacy as a social guest. Accordingly, we affirm the ruling of the district court denying the motion to suppress and admitting the evidence seized. This holding makes it unnecessary to consider Ortiz's probable-cause argument.

## IV. *The Sentencing Issues.*

▪ A. *Enhancement of sentence.* Ortiz was charged with distributing methamphetamine and cocaine to a person under the age of eighteen while within 1000 feet of a public park in violation of Iowa Code section 124.406(1)(a) (1997).[1] This section imposes a five-year minimum for distributing drugs, or possessing with intent to distribute them, to a person under the age of eighteen. This section also enhances the mandatory minimum to ten years:

[I]f the substance was distributed *in or on, or within one thousand feet of,* the real property comprising a public or private elementary or secondary school, *or in or on* the real property comprising a public park, public swimming pool, public recreation center, *or on* a marked school bus.

(Emphasis added.)

▪ At trial Ortiz challenged the trial court's application of section 124.406(1)(a) on the basis of insufficient evidence to show the land surrounding a nearby library was actually a park within the meaning of the statute. However, he did not argue, as he does on appeal, that the clause "within one thousand feet" does not modify "public park." We believe the language "within one thousand feet" modifies only "private, elementary, or secondary school," not "public park, public swimming pool, [or] public recreation center." Each of these listed places has its own modifier, and the modifier for public parks is "in or on." When the text of a statute is plain and its meaning clear, we will not look for a meaning beyond the express terms of the statute. *State v. Guzman–Juarez,* 591 N.W.2d 1, 2 (Iowa 1999). Moreover, penal statutes are to be strictly construed, and all doubts resolved in favor of the accused. *State v. Allison,* 576 N.W.2d 371, 373 (Iowa 1998).

While Ortiz did not object to his enhanced sentence on the basis of statutory interpretation, that is not fatal to his claim on appeal because the sentence is void to the extent it is not based on a proper interpretation of a statute. The judgment may be modified by this court even in the absence of objection. *See State v. Tornquist,* 600 N.W.2d 301, 307 (Iowa 1999) (holding improper enhancement of statute may be corrected at any time); *State v.*

---

1. Ortiz argues this section does not apply to him because (1) Moranville was emancipated and therefore not a minor, and (2) the State did not show Ortiz knew she was under 18. Under the statute, the targeted distributees are persons under 18, not minors, so emancipation is irrelevant. Furthermore, nothing in § 124.406(1)(a) suggests that a defendant's knowledge of age is a prerequisite to conviction. We therefore reject these arguments.

*Austin,* 503 N.W.2d 604, 607 (Iowa 1993) (holding an illegal sentence is void and must be vacated even without objection by defendant at trial). Accordingly, we vacate the sentences on counts II and IV insofar as they are enhanced by proximity to a park.

B. *Withholding of mittimus.* Ortiz also objects to that part of the court's judgment in which it withheld mittimus until conclusion of federal criminal proceedings. The State concedes this was error, and we agree. Accordingly, we vacate that part of the judgment and remand for entry of a judgment to provide for immediate mittimus.

We affirm the convictions, vacate the sentences, and remand for resentencing.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; CASE REMANDED FOR RESENTENCING.**

All justices concur except TERNUS, J., who takes no part.