In the Matter of the WELFARE
OF B.R.K.

No. C7–01–1466.

Supreme Court of Minnesota.

April 3, 2003.

Lori J. Marco, Briggs and Morgan, Special Ass't State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, State Attorney General, St. Paul, MN, Dwayne Knutsen, Chippewa County Attorney, J. Richard Stermer, Assistant County Attorney, Montevideo, MN, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

After receiving a report of an underage drinking party at a private home, two Chippewa County sheriff's deputies entered and searched the home without obtaining a search warrant. As a result of their search, the deputies found appellant B.R.K. and three other teenagers hiding behind a furnace in the basement. When questioned by the deputies, B.R.K. admitted to consuming alcohol. He also tested positive for alcohol consumption. B.R.K. was subsequently charged with consumption of alcoholic beverages by a minor in violation of Minn.Stat. § 340A.503, subd. 1 (2002). At trial, B.R.K., who was not a resident of the home, moved to suppress all evidence gained by the warrantless entry and search. The district court denied the motion, concluding that B.R.K. did not have a reasonable expectation of privacy in the home and therefore did not have capacity to challenge the warrantless entry and search. The court then found B.R.K. guilty and adjudicated him a petty offender. The court of appeals affirmed. We reverse.

On the evening of March 10, 2001, B.R.K. attended a party at a private home in Chippewa County. The party was hosted by B.A.O. who lived at the home with his mother and stepfather. B.A.O.'s mother and stepfather did not authorize the party and were out of town on the date of the party. The party commenced at approximately 10:00 p.m. following a high school dance. About 14 teenagers attended and some of them consumed alcohol. B.A.O.'s stepbrother also was present at the party.

Between 10:30 and 11:00 p.m., the mother of one of the teenagers arrived at the home to pick up her daughter. After observing the activities, she warned the teenagers that the police may be called. The party then came to an abrupt end and all but four of the participants left. B.R.K. remained at the home along with B.A.O. and two other teenagers. The four remaining teenagers turned off the lights and attempted to lock all of the doors, but, due to ice buildup, they were unable to lock the front door. They then sat on a couch, talked, and watched television with the volume turned all the way down.

Meanwhile, at approximately 11:15 p.m., Deputy Irek Marcinkowski of the Chippewa County Sheriff's Department received

a report of an underage drinking party at B.A.O.'s home. Concerned that there would be a large number of teenagers present at the party, Marcinkowski contacted Deputy Aalfs for back up and waited for Aalfs' arrival at the dispatch center. Aalfs arrived at the dispatch center at approximately 11:50 p.m. and the two deputies then drove to the home, arriving at approximately 11:55 p.m. When the four teenagers noticed the deputies' car pull into the driveway, they went to a back room in the basement, shut the door, and hid behind the furnace.

Upon arrival, Marcinkowski observed one car in the driveway. He also noticed that the home was dark except for an illuminated beer sign and another dim light that could be seen through a basement window. The home was a split-entry style home, with basement windows lower than waist level. While walking toward the front door of the home, Marcinkowski looked through the basement window and observed a built-in bar. Only after shining his flashlight through the window was he able to ascertain that there were open hard liquor containers and beer bottles on top of the bar. The deputies then knocked on the front door and announced themselves.

While the deputies were at the front door, a motor vehicle pulled into the driveway. The driver was the same woman who had earlier notified the Sheriff's Department about the party. The woman wanted one of the teenagers, allegedly inside the home, removed from the home because the teenager was supposed to be at her house with her daughters.[1] The woman also identified the car in the driveway as belonging to the teenager she was there to pick up.

Marcinkowski testified that at this point he had multiple reservations about the safety of the teenagers inside the home. His concern primarily centered on the various safety hazards associated with teenagers consuming alcohol and the possibility that the teenagers would sustain injuries if they left the home under the influence of alcohol. Moreover, because of an earlier unrelated burglary of the home, he had knowledge that there were guns inside the home.

The deputies knocked on the front door a few more times. When there was no answer, they opened the door, entered the home, and announced themselves. Aalfs searched the upper level while Marcinkowski searched the basement. Marcinkowski walked down the hallway, searched two bedrooms, and finally opened a closed door. The door led to a backroom where he found the four teenagers hiding behind the furnace. When questioned by Marcinkowski, B.R.K. admitted to consuming alcoholic beverages. The deputy administered a preliminary breathalyzer test, and B.R.K. tested positive for alcohol consumption. B.R.K. was then charged with consumption of alcoholic beverages by a minor in violation of Minn.Stat. § 340.503, subd. 1 (2002).

On May 24, 2001, a trial was held before the court. B.R.K. chose not to testify in his own defense. B.A.O. and Marcinkowski were the only two witnesses to testify. B.A.O. testified that he brought three teenagers to the party and that he did not know most of the other guests. It is unclear from the record whether the other guests were invited by B.A.O.'s stepbrother or merely attended the party with the consent of B.A.O. and/or his stepbrother. B.A.O. testified that "probably" some of the guests entered the residence without

---

1. The district court erred when it found that the woman driving the vehicle was at the home to have her minor child removed from the home.

his or his stepbrother's explicit consent, but "they knew that they could" enter the home and attend the party. B.R.K. was neither one of the teenagers B.A.O. brought to the party nor was B.R.K. personally invited to the party by B.A.O. Nevertheless, B.A.O. testified that B.R.K. was a friend of his as well as a friend of his stepbrother and "was allowed to be" at the party.[2]

During the trial, B.R.K. moved to suppress all evidence gained by the warrantless entry and search. Marcinkowski was then questioned about why he and Aalfs did not obtain a warrant before entering and searching the home, and gave the following reasons:

Well under circumstances like that it's not always quite easy to obtain a warrant when you have one vehicle team there [']cause in order to obtain a search warrant it's more than just calling my office. Actually we have to leave the property, and actually type a form, a warrant, and have—we have to find a judge that is willing to look over it, and sign it, and such. So it's quite[indiscernible] and we did not have the comfort of leaving the property because if we would leave the property then I'm sure from past experience that the people that were there would probably be gone by the time that we return with the warrant.

\* \* \* \*

And plus we were aware that there were guns also, quite a few guns at that household as well.

When questioned further about whether he could have obtained assistance from a neighboring police department, Marcinkowski replied "Sure we could, but weekend evenings [in the] City of Montevideo

also get[ ] quite busy too so at that time it wasn't that convenient." The district court denied B.R.K.'s motion and admitted the evidence.

The district court denied B.R.K.'s motion on the basis that B.R.K. did not have a reasonable expectation of privacy in the home and therefore did not have capacity to challenge the warrantless entry and search. In reaching this conclusion, the court emphasized that B.R.K. was not invited into the home. The court also noted that someone with authority to deny entry did not control attendance at the party, and that B.R.K. was neither a temporary resident of the home nor an overnight guest. Lastly, the court concluded that by concealing himself behind the furnace, B.R.K. demonstrated that he lacked even a subjective expectation of privacy. The court then found B.R.K. guilty of the charged offense. At the disposition hearing, the court adjudicated B.R.K. a petty offender, placed him under the supervision of community corrections for a period of 6 months, and ordered him to perform 30 hours of community service.

B.R.K. appealed, contending that as a social guest he had a legitimate expectation of privacy in the home where he attended the party and therefore had capacity under the Fourth Amendment to challenge the warrantless entry and search. The court of appeals concluded that B.R.K. may have demonstrated a subjective expectation of privacy when he hid behind the furnace. *In the Matter of the Welfare of B.R.K.*, No. C7–01–1466, 2002 WL 1050385, at \*2 (Minn.App. May 28, 2002). However, the court also concluded that B.R.K.'s expectation of privacy was not one that society would recog-

---

2. The district court made a finding that B.A.O. "knew" only three of the party guests. This finding is erroneous because B.A.O. also knew and was friends with B.R.K. Therefore, at a minimum, B.A.O. knew the three guests he brought with him, plus B.R.K.

nize as reasonable. *Id.* In reaching this conclusion, the court relied on the following: (1) B.R.K. was not an overnight guest and was not given keys to the premises; (2) B.R.K. was present at an underage drinking party held without the consent of the adults who owned the home; (3) B.R.K. was not specifically invited to the party by the juvenile host; and (4) B.R.K. was on the premises for only a "couple of hours" before the police arrived. Because the court determined that B.R.K. lacked a reasonable expectation of privacy, it did not reach the issue of whether the warrantless entry and search violated the Fourth Amendment.

We granted B.R.K.'s petition for review. On appeal, we are asked to determine (1) whether B.R.K. had a reasonable expectation of privacy in the home; (2) whether the warrantless search of the home violated the Fourth Amendment; and (3) whether exigent circumstances justified the warrantless entry and search.

### I.

B.R.K. asserts that the sheriff's deputies violated the Fourth Amendment when they conducted a warrantless search of B.A.O.'s home and therefore all evidence obtained as a result of the search must be suppressed. Before we can consider the validity of the search, we must first determine whether B.R.K. has a right under the Fourth Amendment to challenge the deputies' conduct. The district court denied the motion to suppress on the grounds that B.R.K. did not have a right under the Fourth Amendment to challenge the search because he lacked a reasonable expectation of privacy in the home. Here, the facts are not in dispute and the district court's decision is a question of law; accordingly, we "independently review the facts and determine, as a matter of law, whether the evidence need be suppressed."

*State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992).

▪ The Fourth Amendment guarantees: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[T]he Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, the Fourth Amendment is a personal right and an individual must invoke its protections. *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). An individual may invoke the protection of the Fourth Amendment by showing "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " *Carter,* 525 U.S. at 88, 119 S.Ct. 469 (quoting *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Thus, the determination of whether B.R.K. can invoke the protections of the Fourth Amendment involves a two-step analysis. First, we must determine whether B.R.K. exhibited an actual subjective expectation of privacy in the home and, second, whether that expectation is reasonable. *See Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).

▪ We first consider B.R.K.'s assertion that he demonstrated a subjective expectation of privacy by taking precautions to protect his privacy. The United States Supreme Court instructs that to determine whether a person has exhibited a subjective expectation of privacy, courts should focus their inquiry on the individual's conduct and whether the individual "[sought] to preserve [something] as private." *Bond*

*v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (citation omitted). Federal courts have concluded that a defendant's attempt to conceal activity or items illustrated a subjective expectation of privacy. *Katz*, 389 U.S. at 352, 88 S.Ct. 507 (concluding that when Katz entered the phone booth, shut the door, and paid the toll he was entitled to assume his conversation would be private); *U.S. v. King*, 227 F.3d 732, 744 (6th Cir.2000) (concluding that the defendant by hiding his cocaine in the basement demonstrated a subjective expectation of privacy in the basement); *U.S. v. Nerber*, 222 F.3d 597, 603 (9th Cir.2000) (concluding that the defendant demonstrated a subjective expectation of privacy by closing the door, drawing the blinds, and ingesting cocaine). An examination of B.R.K.'s conduct demonstrates that he sought to conceal his presence in the home and thereby preserve his privacy. B.R.K. and the other teenagers attempted to lock all the outside doors to the home, turned off lights, and turned the television volume all the way down. When the deputies arrived, B.R.K. and the other teenagers hid in a backroom in the basement, closed the door, and concealed themselves behind the furnace. Based on these actions, we conclude that B.R.K. demonstrated an actual subjective expectation of privacy in the home.

■ We next consider whether B.R.K.'s expectation of privacy is reasonable, i.e., one that is recognized by society. It is well-settled law that individuals have a reasonable expectation of privacy in their own homes and thus have the capacity to challenge warrantless entries and searches of their homes. *See United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984); *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). But here, we must determine whether B.R.K.'s expectation of privacy in the home of *another* is reasonable.

Fourth Amendment jurisprudence involving an individual's reasonable expectation of privacy in the home of another has evolved since the Supreme Court addressed the issue over 40 years ago in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In *Jones*, the Court concluded, "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress." *Id.* at 267, 80 S.Ct. 725. Jones was arrested in his friend's apartment during the execution of a search warrant. *Id.* at 258–59, 80 S.Ct. 725. He moved to suppress evidence obtained through the search on the ground that the warrant was not supported by probable cause. *Id.* at 259, 80 S.Ct. 725. Jones's friend had given him a key to the apartment and permission to use it. *Id.* Jones had slept at the apartment "maybe a night." *Id.* On the day of the search, Jones's friend was out of town and Jones admitted himself into the apartment with the key. *Id.* After concluding that Jones's friend consented to his presence in the apartment, the Court held that Jones was legitimately on the premises and had the capacity to challenge the validity of the search. *Id.* at 267, 80 S.Ct. 725.

Eighteen years later, in *Rakas*, the Supreme Court repudiated the "legitimately on premises" standard as too broad. *Rakas*, 439 U.S. at 142, 99 S.Ct. 421. The Court then announced that the proper inquiry to determine whether an individual has capacity to claim the protection of the Fourth Amendment is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas*, 439 U.S. at 143, 99 S.Ct. 421. Nevertheless, the Court reaffirmed the factual holding in *Jones*. Noting that Jones had per-

mission to use his friend's apartment, had a key to the apartment, kept possessions in the apartment, and had dominion and control over the apartment, the Court in *Rakas* concluded that Jones had a reasonable expectation of privacy in his friend's apartment. *Id.* at 149, 99 S.Ct. 421.

Next, in *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court concluded that overnight guests have an expectation of privacy in a host's home that society is prepared to recognize as reasonable; thus, overnight guests have the capacity to claim the protection of the Fourth Amendment. In considering the issue, the Court rejected the argument that an overnight guest must have the power to "admit or exclude" others in order to claim Fourth Amendment protection. *Id.* at 99, 110 S.Ct. 1684. The Court stated that hosts generally respect the privacy interests of their guests despite the fact that guests do not have a legal interest in the home or a legal authority to admit or exclude others from the home. *Id.* The Court also looked to the "everyday expectations of privacy" shared by society:

> Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

*Id.* at 98, 110 S.Ct. 1684.

Most recently, in *Carter*, 525 U.S. at 91, 119 S.Ct. 469, the Supreme Court concluded that the two defendants, visiting the lessee's apartment to bag cocaine, did not have a reasonable expectation of privacy in the apartment and therefore lacked capacity to challenge the search. In *Carter*, the defendants were at the lessee's apartment for about 2 ½ hours "for the sole purpose of packaging * * * cocaine." *Id.* at 86, 119 S.Ct. 469. They had never previously been to the lessee's apartment and gave the lessee cocaine as payment for use of the apartment. *Id.*

In determining that the defendants in *Carter* lacked a reasonable expectation of privacy, the Supreme Court focused on the specific facts of the case and concluded that for the defendants the apartment was merely a place to complete a business transaction. *Id.* at 90, 119 S.Ct. 469. Next, the Court concluded that " '[a]n expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home.' " *Id.* (quoting *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)). The Court then stated:

> If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between.

*Id.* at 91, 119 S.Ct. 469. Based on evidence that the defendants were at the apartment for a short period of time, for purely commercial purposes, and lacked any previous connection to the lessee of the apartment, the Court concluded that the defendants' "situation is closer to that of one simply permitted on the premises." *Id.*

It is within the framework of this case law that we analyze B.R.K.'s expectation of

privacy. B.R.K. does not contend that he was an overnight guest. Therefore, the narrow holding of *Olson*—that overnight guests have a reasonable expectation of privacy in their host's home—is not directly applicable. However, B.R.K. argues that he was a short-term social guest in B.A.O.'s home. The state does not respond directly to this argument, but instead argues that B.R.K. was "merely on the premises" and therefore lacks a reasonable expectation of privacy. The state relies on the following facts to support its position that B.R.K. does not have a reasonable expectation of privacy: (1) the owners of the home did not authorize the party; (2) B.R.K. was not specifically invited to the party; (3) individuals were going in and out of the home throughout the duration of the party; and (4) B.R.K. was at the home for a short period of time, about two hours.

■ The state's arguments are unpersuasive. The state focuses on B.R.K.'s status during the party, which is not dispositive for purposes of our analysis because the party was over when the police entered and searched the home. The party ended some time between 10:30 p.m. and 11:00 p.m. when all but three of the attendees left. The deputies did not arrive at the home until 11:55 p.m., approximately one hour after the party ended. Thus, our analysis must also focus on B.R.K.'s status from the time the party ended until the deputies found him in the basement. Although B.R.K. was not specifically invited to the party, his presence in B.A.O.'s home during, and more importantly after, the party was consented to by B.A.O. Upon conclusion of the party, B.A.O. engaged in social interaction with his remaining guests when they sat in the basement talking and watching television. B.A.O. also considered B.R.K. a friend, which demonstrates a previous social connection between the two teenagers. Finally, not only did B.A.O. consent to B.R.K.'s presence in the home, but he also shared his privacy interest with B.R.K. by allowing him to participate in locking the doors, turning off the lights, and hiding behind the furnace. Based on these facts, we conclude that B.R.K. was a short-term social guest in B.A.O.'s home.

Having concluded that B.R.K. was a short-term social guest, we next consider whether such a short-term social guest has a reasonable expectation of privacy in his host's home. The state argues that under the plurality opinion of *Carter*, B.R.K. does not have a reasonable expectation of privacy because *Carter* distinguishes between an overnight guest, who does have a reasonable expectation of privacy, and a person merely present as a guest, who does not. In contrast, B.R.K. contends that as a short-term social guest he has a reasonable expectation of privacy in the home. He also asserts that *Carter* is inapposite because the Supreme Court based its decision on the commercial nature of the transaction and did not analyze the defendants' expectation of privacy in the context of an overnight guest versus a short-term social guest.

In support of its position that under *Carter* those "present as a guest" do not have a reasonable expectation of privacy, the state quotes the following language from *Carter*: "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." 525 U.S. at 90, 119 S.Ct. 469. This statement does not support the state's position. It follows a discussion of *Jones* and specifically refers to the Supreme Court's repudiation of the *Jones* rule that anyone legitimately on the premises had the capacity to challenge the legality of a search. *Id.* Additionally, the

plurality in *Carter* left open the possibility that nonovernight guests with a social nexus to the owner may have a reasonable expectation of privacy. First, the Court recognized that the defendants in *Carter*, persons on the premises to conduct business, had a greater expectation of privacy than a person "legitimately on the premises." *Id.* at 91, 119 S.Ct. 469. By analogy, short-term social guests also have a greater expectation of privacy than an individual merely "legitimately on the premises." Second, the Court emphasized the lack of a previous relationship between the defendants and the lessee, implying that guests with a social connection to the host may have a legitimate expectation of privacy. *Id.* Therefore, *Carter* does not prohibit us from concluding that short-term social guests do have a reasonable expectation of privacy.

A close reading of *Carter* reveals that it does not address the issue of whether short-term social guests have a reasonable expectation of privacy in their host's home. In *Carter*, the Supreme Court did not address the defendants' expectation of privacy in terms of their status as social guests. Instead, the Court focused its analysis on the commercial nature of the defendants' presence in the home. Accordingly, only after taking into account the lesser expectation of privacy individuals have in commercial property did the Court conclude that the defendants lacked a reasonable expectation of privacy in the apartment. The animating principle behind *Carter* is that an individual's expectation of privacy in commercial premises is less than an individual's expectation in a private residence, not that short-term social guests do not have a reasonable expectation of privacy. *Carter*, 525 U.S. at 90, 119 S.Ct. 469.

Other courts have interpreted *Carter* similarly. *See United States v. Higgins*, 282 F.3d 1261, 1271 (10th Cir.2002) (stating "*Carter* effectively heightened the burden for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, when the defendant's presence in the dwelling is for a commercial or business purpose") (internal quotations omitted); *State v. Trecroci*, 246 Wis.2d 261, 630 N.W.2d 555, 569–70 (App. 2001) (rejecting the state's argument that *Carter* stands for the proposition that only overnight guests have standing to challenge a search and concluding that under *Carter* a nonovernight guest may have standing to challenge a search when "the guest's relationship with the host and the host's property is more firmly rooted"). *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir.2000) (interpreting *Carter* to hold that defendants "had no legitimate expectation of privacy because they failed to demonstrate they were guests on the premises for a personal occasion, rather than for strictly business purposes").

In addition, the concurring and dissenting opinions in *Carter* lend credence to B.R.K.'s assertion that short-term social guests have a reasonable expectation of privacy. Three dissents and two concurrences in *Carter* embrace the position that short-term social guests have a reasonable expectation of privacy in their host's home. 5 Wayne R. LaFave, *Search and Seizure* § 11.3 (3d ed. 1996) (Supp.2003).

In a concurring opinion in which he gave the plurality the deciding vote, Justice Kennedy stated:

> I join the Court's opinion, for its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home.

*Carter*, 525 U.S. at 99, 119 S.Ct. 469 (Kennedy, J., concurring). But Justice Kennedy concurred with the plurality because in

his view the defendants did not qualify as social guests.

The dissent written by Justice Ginsburg and joined by Justices Stevens and Souter concluded that, "when a homeowner chooses to share the privacy of her home and her company with a short-term guest," the guest's subjective expectation of privacy is one our society is prepared to recognize as reasonable. *Id.* at 109, 119 S.Ct. 469 (Ginsburg, J., dissenting). To reach this conclusion, the dissent first recognized that the home is "the most essential bastion of privacy recognized by the law." *Id.* at 106, 119 S.Ct. 469. The dissent then noted that to deny nonovernight social guests Fourth Amendment protections would put hosts at risk for unreasonable searches and seizures of their homes when they invite short-term social guests into their homes. *Id.* at 107–08, 119 S.Ct. 469. The dissent further reasoned that if short-term social guests are not protected by the Fourth Amendment the police may be tempted "to pry into private dwellings without warrant, to find evidence incriminating guests who do not rest there through the night." *Id.* at 108, 119 S.Ct. 469. Thus, "people are not genuinely secure in their * * * houses * * * against unreasonable searches and seizures if their invitations to others increase the risk of unwarranted governmental peering and prying into their dwelling places." *Id.* (internal quotations and citations omitted). The dissent then noted that the logic behind *Olson* extends to short-term social guests because "[o]ne need not remain overnight to anticipate privacy in another's home." *Id.* at 109, 119 S.Ct. 469.

Justice Breyer agreed with the dissent's conclusion that the defendants had the capacity to claim Fourth Amendment protec-

tion. But he concurred in the judgment because he concluded that the search did not violate the defendants' Fourth Amendment rights. *Id.* at 103, 119 S.Ct. 469. While not binding authority, the dissenting and concurring opinions in *Carter* indicate that a majority of the Supreme Court considers a short-term social guest's expectation of privacy legitimate.

◼ We view the dissent's reasoning as being particularly persuasive. First, we agree that to fully protect an individual's privacy in his or her own home, a social guest in the host's home must also be able to claim protection of the Fourth Amendment. Second, we also conclude that the essential reasoning in *Olson* is applicable to short-term social guests. The key analysis in *Olson* centered on whether overnight visits to other people's homes qualified as a "longstanding social custom that serves functions recognized as valuable by society." *Olson,* 495 U.S. at 98, 110 S.Ct. 1684. Like an overnight visit, entering the home of another for a short-term social visit is also "a longstanding social custom that serves functions recognized as valuable by society." *Olson,* 495 U.S. at 98, 110 S.Ct. 1684. Here, B.R.K. was in B.A.O.'s home spending time with his friend B.A.O., talking, and watching television. There are numerous other occasions for which people visit the home of another without spending the night: holiday gatherings, dinner parties, and family events to name a few. Short-term social visits are just as common as overnight visits, if not more so. Accordingly, we conclude that as a short-term social guest, B.R.K. had a reasonable expectation of privacy in his host's home and therefore can claim the protections of the Fourth Amendment.[3]

---

**3.** Other courts have relied on these dissenting and concurring opinions when analyzing whether a defendant has the capacity to in-

voke Fourth Amendment protections. *United States v. Higgins,* 282 F.3d 1261, 1271 (10th Cir.2002) (concluding that *Carter* must be an-

Our conclusion is further buttressed by the reasoning used in the decisions of other courts that have determined short-term guests have a reasonable expectation of privacy in their host's home. *See Trecroci,* 630 N.W.2d at 569–70 (concluding that the defendant had capacity to object to a search of another's attic where she was the fiancée of the owner and had used the attic for socializing on prior occasions); *Pollard,* 215 F.3d at 647–48 (holding that the defendant had capacity to object to a search of another's home because the defendant had been friends with the lessee for 7 years, had spent the night at the home on prior occasions, sometimes ate meals with the family in the home, and kept some personal belongings in a closet in the living room); *Morton v. United States,* 734 A.2d 178, 182 (D.C.1999) (concluding that defendant had a legitimate expectation of privacy in the home of another because the defendant had known the owner for over 10 years, the owner invited him into the home, and the defendant was a frequent visitor to the home); *Bonner v. Anderson,* 81 F.3d 472, 475 (4th Cir.1996) (holding in the context of 42 U.S.C. § 1983 that Bonner had a reasonable expectation of privacy in another's home because Bonner was a frequent visitor to the residence and often ran errands for the owner of the home).[4]

■ Finally, we address B.R.K.'s argument that his expectation of privacy is also reasonable under Article I, Section 10 of the Minnesota Constitution. The provisions against unreasonable searches and seizures in Article I, Section 10 mirror those of the Fourth Amendment. Article I, Section 10 reads "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." Therefore, when we interpret Article I, Section 10 of the Minnesota Constitution, decisions of the Supreme Court interpreting the Fourth Amendment are of persuasive, although not compelling, authority. *State v. Harris,* 590 N.W.2d 90, 97 (Minn.1999). However, we are free to interpret the Minnesota Constitution as affording greater protection against unreasonable searches and seizures than the United States Constitution, but do not do so cavalierly. *Id.* at 97–98.

On two occasions, we have interpreted Article I, Section 10 as affording greater protections against unreasonable searches and seizures than the Fourth Amendment. In *Ascher v. Comm'r of Public Safety,* 519 N.W.2d 183 (Minn.1994), we declined to follow the Supreme Court's holding in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412

alyzed in light of Justice Kennedy's concurrence where he concluded that nonovernight, social guests generally have a legitimate expectation of privacy); *State v. Ortiz,* 618 N.W.2d 556, 560 (Iowa 2000) (stating "[i]n deciding the present case, we must be mindful of this [Justice Kennedy's] concurring opinion, as well as the plurality opinion, because, without Justice Kennedy's concurrence, the Court's finding of no reasonable expectation of privacy would not have prevailed"); *Morton v. United States,* 734 A.2d 178, 182 (D.C.1999) (relying on the various opinions in *Carter,* which conclude that social guests have a general expectation of privacy, the court concluded that the defendant, as a

guest of the home owner, did have a reasonable expectation of privacy).

4. Other courts have signaled a future willingness to find that short-term social guests do have a legitimate expectation of privacy. *See United States v. Gamez–Orduno,* 235 F.3d 453, 459 n. 8 (9th Cir.2000) ("While overnight guest status is sufficient for Fourth Amendment protection, it may not be necessary."); *State v. Ortiz,* 618 N.W.2d 556, 561 (Iowa 2000) (holding that defendant was on the premises for commercial purposes and therefore "failed to show he had a reasonable expectation of privacy as a social guest").

(1990). In *Sitz*, the Court concluded that roadblocks where law enforcement officers stop and investigate all drivers for drunk driving do not violate the Fourth Amendment. However, we concluded that roadblocks where law enforcement officers stop all drivers in an effort to apprehend drunk drivers violate Article I, Section 10, which requires an objective individualized articulable suspicion of criminal wrongdoing.

In *California v. Hodari*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court concluded that a seizure occurs when a person submits to a show of authority by the police. In *In the Matter of the Welfare of E.D.J.*, 502 N.W.2d 779 (Minn.1993), we declined to follow the holding in *Hodari* and continued to adhere to the long-standing rule that a seizure occurs when a reasonable person feels she is not free to leave.

■■■■ Under Article I, Section 10, only defendants who can demonstrate a legitimate expectation of privacy to the area searched may contest the validity of the search. *State v. Carter*, 596 N.W.2d 654, 658 (Minn.1999). It is well established that under Article I, Section 10, an individual's expectation of privacy in his or her own home is reasonable. We conclude that to fully protect the privacy interest an individual has in his or her home, short-term social guests, such as B.R.K., must also be able to claim the protection of Article I, Section 10. Therefore, we conclude that even if short-term social guests do not have a reasonable expectation of privacy under the Fourth Amendment, their expectation is legitimate under Article I, Section 10 of the Minnesota Constitution. Accordingly, we hold that the district court erred when it found that B.R.K. did not have a reasonable expectation of privacy.

II.

Having determined that B.R.K. had a reasonable expectation of privacy in B.A.O.'s home, we now consider the validity of the sheriff's deputies' search. B.R.K. contends that the deputies violated the Fourth Amendment when they peered into the home through the basement window with a flashlight. Moreover, he argues, this violation became more egregious when the deputies conducted a warrantless search of the home.

■■■■ The Fourth Amendment and Article I, Section 10 of the Minnesota Constitution protect individuals from unreasonable searches and seizures by the government of "persons, houses, papers and effects." "A search occurs whenever governmental agents intrude upon an area where a person has a reasonable expectation of privacy." *State v. Hardy*, 577 N.W.2d 212, 215 (Minn.1998). Absent exigent circumstances and probable cause, or consent, a warrantless entry and search of a private residence is *per se* unreasonable and violates the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *In re D.A.G.*, 484 N.W.2d 787, 789 (Minn. 1992); *Othoudt*, 482 N.W.2d at 222. All evidence obtained by illegal searches is inadmissible in court and the fruits of a warrantless entry made without probable cause and exigent circumstances must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *State v. Paul*, 548 N.W.2d 260, 264 (Minn. 1996).

■■■■ Here, the deputies violated the Fourth Amendment and Minnesota Constitution Article I, Section 10 when they entered and searched the home without first obtaining a search warrant. We reach this conclusion without addressing B.R.K.'s argument that the deputy's conduct of looking into the basement window with a flash-

light constituted a search. Accordingly, the fruits of the entry and search must be suppressed unless there were exigent circumstances to justify the warrantless search.[5] *Paul*, 548 N.W.2d at 264.

Neither the district court nor the court of appeals reached the issue of exigent circumstances because they determined that B.R.K. could not invoke the protection of the Fourth Amendment. B.R.K. argues that exigent circumstances did not exist to justify the warrantless entry. Specifically, B.R.K. asserts that the possibility of weapons in the home and the request of a woman, who was not related to any of the minors allegedly in the house,[6] do not qualify as exigent circumstances.

 In some instances, a "single factor" warrants a finding of exigent circumstances. We have found that "hot pursuit of a fleeing felon, imminent destruction or removal of evidence, protection of human life, likely escape of the suspect, and fire" qualify as exigent circumstances justifying a warrantless search and seizure. *D.A.G.*, 484 N.W.2d at 791 (quoting *State v. Gray*, 456 N.W.2d 251, 256 (Minn. 1990)). When a "single factor" exigent circumstance does not exist, we apply a totality of the circumstances test. We look to the following factors first articulated in *Dorman v. United States* as a guide:

(a) whether a grave or violent offense is involved; (b) whether the suspect is reasonably believed to be armed; (c) whether there is strong probable cause connecting the suspect to the offense; (d) whether police have strong reason to believe the suspect is on the premises;

(e) whether it is likely the suspect will escape if not swiftly apprehended; and (f) whether peaceable entry was made.

*D.A.G.*, 484 at 791 (quoting *Gray*, 456 N.W.2d at 256, citing *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir. 1970)).

 Here, the only single factor that approximates exigent circumstances is the possibility of danger to human life. Deputy Marcinkowski testified that he was concerned for the teenagers' safety because he had "reasonable suspicion" to believe that teenagers were drinking alcoholic beverages inside the home. Moreover, he had knowledge that there were guns inside the home. While serious, these concerns do not qualify as exigent circumstances. Although the deputies knew that there were guns in the home, there was no indication that the teenagers had armed themselves or planned to use the guns. Moreover, there was no indication that the teenagers were suffering from any serious medical consequences of alcohol consumption. Thus, we conclude that a single factor exigent circumstance did not exist.

We next consider whether exigent circumstances exist under the totality of the circumstances. Applying the *Dorman* factors, we conclude that exigent circumstances do not exist. While a serious offense, underage drinking is not a "grave or violent" offense like robbery or assault. Although there were guns inside the home, there was no indication that the teenagers themselves were armed. The probable cause here was not particularly strong. As evidence that there was a teenage

---

**5.** B.A.O. and Marcinkowski both testified that none of the teenagers consented to the deputies' warrantless search of the home.

**6.** The woman's request to remove a teenager from the home does not constitute an exigent circumstance. The woman was not the owner of the home, nor was she the parent or guardian of the teenager allegedly in the home. At best, this interaction supports the argument that probable cause existed to believe that the teenagers were inside the home consuming alcohol.

drinking party going on, the police relied on the informant's telephone call and her statement that the car in the driveway belonged to a teenager suspected of being inside the home. However, when the deputies arrived, the house was dark, quiet, and there was only one car in the driveway. These factors do not support a finding of exigent circumstances.

We also observe that the deputies' conduct was inconsistent with the presence of exigent circumstances. Once Marcinkowski received the informant's tip about the party, he was aware that teenagers were allegedly consuming alcohol and that there were guns inside the home. Despite this knowledge, Marcinkowski waited approximately 35 minutes at the dispatch center for Aalfs to arrive before proceeding to the residence.

Finally, Marcinkowski admitted that one reason the deputies did not obtain a warrant was because it was inconvenient to leave the property and they feared that if they left, the teenagers would also leave. If concerned about the teenagers leaving the property, the deputies should have called other police officers for assistance. Mere inconvenience does not justify an unreasonable intrusion into an individual's home.

In the absence of exigent circumstances, the warrantless entry and search of B.A.O.'s home violated the Fourth Amendment and Minnesota Constitution Article I, Section 10. Therefore, the fruits of the entry and search must be suppressed. *Paul,* 548 N.W.2d at 264.

Reversed.

HANSON, J., took no part in the consideration or decision of this case.